**FOURTH DIVISION**
**DILLARD, C. J.,**
**RAY and SELF, JJ.**

**NOTICE: Motions for reconsideration must be** *physically received* **in our clerk's office within ten days of the date of decision to be deemed timely filed.**
**http://www.gaappeals.us/rules**

**January 24, 2018**

# In the Court of Appeals of Georgia

A17A1652. WILLIAMS v. JOHNSON.

DILLARD, Chief Judge.

Hope "Elmo" Williams appeals the trial court's denial of his motion for summary judgment in Joshua Johnson's premises-liability case against him, in which Johnson sought to recover damages for a serious injury he suffered while on Williams's property. Specifically, Williams argues that the trial court erred in denying his motion because (1) Johnson admittedly had superior knowledge of the hazards associated with the conduct that caused his injury; (2) he breached no legal duty owed to Johnson; (3) Johnson assumed the risk of the injury by his conduct; (4) Johnson failed to exercise ordinary care for his own safety; and (5) Johnson failed to establish the essential element of proximate cause. For the reasons set forth *infra*, we reverse.

Viewing the evidence in the light most favorable to Johnson (*i.e.*, the nonmoving party),[1] the record shows that Williams, who is paralyzed from the chest down, was a close family friend of Johnson. In March 2014, Williams hired Johnson to help him with various home-repair projects. At the time Williams hired him, Johnson had approximately 18 years of experience working for roofing companies, which involved tasks such as being a "laborer, roofing houses, [and] hanging gutters. . . ." On May 1, 2014, Johnson went to Williams's home to help him "frame out a bathroom" in his basement.[2] As part of the project, Johnson and Williams planned to use crow bars to remove a mirror that was attached to three horizontal wooden boards with liquid nails (which are a type of glue). The first board was removed without incident, and Johnson carried it outside and placed it in a debris pile in the yard. Johnson returned to the basement, and when he and Williams attempted to remove the second board, which was "flush to the glass," the mirror "started breaking and . . .

---

[1] *See, e.g.*, *Vratsinas Const. Co. v. Chitwood*, 314 Ga. App. 357, 357-58 (723 SE2d 740) (2012).

[2] Johnson averred that Williams regularly paid him to help "with odd jobs around his home," and that he expected Williams to pay him for the work he did on the date in question.

2

shattering, like spider webbing."[3] And while the board did ultimately detach from most of the mirror, there was still an 8 to 12 inch shard of glass glued to it.

According to Johnson, once he took the second board outside to discard it, he noticed that the piece of glass was "on the back of the board and it started getting skinnier [as it] came up, . . . and came to . . . a point" and was "[v]ery sharp." Johnson carried the board vertically with one hand on each side over to a large trash can near the debris pile. Although Johnson had placed the first board in the designated debris pile, he decided to dispose of the second board in the trash can because, if he put it in the debris pile, the glass could potentially break in the yard when subsequent boards were discarded there. But when Johnson placed the board into the trash, intending "to knock the glass off" with "a tool or a hammer[,]" the glass immediately cut both main arteries in his right hand, slicing "all of [his] ligaments . . . ."

Although Johnson's deposition testimony is consistent regarding *when* his injury occurred, it is very unclear and contradictory as to exactly *how* it occurred and what exactly caused the shard of glass to come into contact with his hand. When first asked whether placing the board in the trash caused it to "bounce back up towards

---

[3] Johnson first testified that the glass shattered, but later testified that it did not shatter. He clarified that the mirror "look[ed] like a spider web" with little light cracks and that some "[s]mall little pieces" of glass fell to the floor.

3

[him][,]" Johnson said that he did not know because it "happened so fast." Johnson also testified that he did not know if any of the glass broke off of the board when the injury occurred or if he ever "fully let go of the board before [he] was injured." But Johnson could not rule out the possibility that he may have let go of the board, which caused it to bounce in a way that the glass shard came back up and sliced his hand.

Later, Johnson testified definitively that the board "never bounced[,]" but also said, "I had the board and I picked it up and as I'm placing it in there [and] then *I don't know what happened next*."[4] And shortly thereafter, Johnson claimed that he *did* know whether the board bounced because "you would have heard it[;]" however, he did not say whether he heard anything. Similarly, despite his earlier claim that he lacked knowledge as to whether the glass shard detached from the board, Johnson testified that the large shard of glass *did not* break off of the board and that he did not even know if it was the glass "that went through [his] hand." Nevertheless, Johnson conceded that he did not know what else could have caused such a serious cut other than the sharp piece of glass. Regardless, when his hand was cut, Johnson's hand bled

---

[4] (Emphasis supplied).

4

so badly that the blood quickly soaked through a new roll of paper towels and at least two cloth towels."[5]

Immediately after the injury, Williams's wife called 911, and paramedics responded to transport Johnson to the hospital for treatment. The laceration to Johnson's hand was so severe that he had two emergency surgeries, spent nine days in the hospital, and attended nine weeks of physical-therapy sessions. Since the incident, Johnson has suffered constant pain in his forearm, developed blood clots in

[5] When confronted with Williams's motion for summary judgment, Johnson submitted a sworn affidavit that contained many statements that conflicted with his earlier deposition testimony, such as that Williams instructed him to dispose of the board in the trash can rather than in the debris pile and to "knock off the glass." While Johnson testified at his deposition that Williams instructed him to place the board in the trash can, he also testified that "the trash can was never discussed." Johnson further testified that Williams *did* and then later that he *did not* instruct Johnson to place the board in the debris pile. And in yet another conflicting statement, Johnson agreed that "the only thing [Williams] specifically told [him] was not to get glass on his driveway so his [car] wouldn't get a flat tire." As a result of Johnson's confusing and contradictory statements, as well as his lack of knowledge as to what exactly occurred, all that is clear is that Johnson carried the second board with the shard of glass attached outside, he placed it in a large empty trash can, and his hand was somehow severely injured immediately when he did so. Because we view the evidence in the light most favorable to the nonmovant, the factual background set forth is gleaned almost exclusively from Johnson's own testimony. Nevertheless, as to the numerous vague and conflicting sworn statements made by Johnson below, we note that "self-contradictory testimony is construed against a party-witness, absent a reasonable explanation for the contradiction." *Shiver v. Norfolk-S. Ry. Co.*, 269 Ga. 168, 169 (496 SE2d 903) (1998) (emphasis omitted).

his hand, can no longer lift heavy items, and needs assistance from others with ordinary daily tasks such as tying his shoes and buttoning his pants. Additionally, Johnson has lost feeling in three fingers on his right hand, and he has to do everything left handed that he did right handed prior to cutting his hand. Johnson has also been unemployed since the incident, as he does not know what kind of work he will be able to do with only one functioning hand.

On February 24, 2016, Johnson filed a complaint against Williams, asserting a premises-liability claim and seeking compensatory damages for his injury, medical expenses, and attorney fees. Williams responded, denying the material allegations in the complaint and asserting several affirmative defenses. Then, following discovery, Williams filed a motion for summary judgment, arguing, *inter alia*, that Johnson's premises-liability claim failed because his knowledge of the risks and dangers associated with carrying and disposing of the large (and very sharp) piece of glass was superior to that of Williams. After the parties filed responsive briefs, the trial court held a hearing at which only legal arguments were made, and ultimately, the court denied Williams's summary-judgment motion. Thereafter, the trial court granted Williams's request for a certificate of immediate review. This Court then granted Williams's request for an interlocutory appeal, and this appeal follows.

6

Summary judgment is proper when "there is no genuine issue of material fact and the movant is entitled to judgment as a matter of law."[6] Additionally, a *de novo* standard of review applies "to an appeal from a grant or denial of summary judgment, and we view the evidence, and all reasonable conclusions and inferences drawn from it, in the light most favorable to the nonmovant."[7] With these guiding principles in mind, we turn now to Williams's specific claims of error.

1. Williams argues that the trial court erred by denying his motion for summary judgment because Johnson admittedly had superior knowledge of the hazards associated with his chosen method of carrying and disposing of a board with a sharp piece of glass attached. We agree that Johnson's own testimony establishes that he had at least equal, if not superior, knowledge as Williams did of the hazard that caused his injury, which precludes recovery on his premises-liability claim.

In Georgia, in order to prevail on a premises-liability claim, a plaintiff must prove that "(1) the owner or proprietor had actual or constructive knowledge of the hazard and (2) the plaintiff lacked knowledge of the hazard despite exercising

---

[6] *Vratsinas Const. Co.*, 314 Ga. App. at 357 (punctuation omitted).

[7] *Id.* at 357-58 (punctuation omitted).

7

ordinary care."[8] Indeed, as a general rule, owners or occupiers of land are "not insurers of the safety of invitees."[9] Thus, in a premises-liability case (such as this one), the mere fact that Johnson was injured, without more, "does not give rise to liability on the part of [Williams]."[10] Instead, the true basis of a property owner's liability for an injury to its invitee is the owner's *"superior knowledge of a condition that may expose the invitees to an unreasonable risk of harm*."[11] Moreover,

---

[8] *Ward v. Autry Petroleum Co*., 281 Ga. App. 877, 877 (637 SE2d 483) (2006); *accord Robinson v. Kroger Co.*, 268 Ga. 735, 748-49 (2) (493 SE2d 403) (1997).

[9] *Orff v. Stonewood Rest. Grp., LLC*, 285 Ga. App. 488, 489 (646 SE2d 702) (2007); *accord Bartlett v. McDonough Bedding Co.*, 313 Ga. App. 657, 658 (722 SE2d 380) (2012) (punctuation omitted). Although Johnson and Williams were long-time friends, the parties do not dispute that, at the time of the injury underlying this appeal, Johnson was an invitee, rather than a licensee. *See Jarrell v. JDC & Assocs., LLC*, 296 Ga. App. 523, 524-25 (675 SE2d 278) (2009) ("An invitee is a person who, by express or implied invitation, has been induced or led to come upon premises for any lawful purpose[,] while a licensee is one who is permitted, either expressly or impliedly, to go on the premises of another, but merely for his own interest, convenience, or gratification. Accordingly, the duty owed to an invitee is greater than that owed to a licensee. An owner owes a duty to an invitee to exercise ordinary care to keep the premises and approaches safe[,] while his duty to a licensee is not to injure the licensee wantonly or wilfully and arises after the owner becomes aware of or should anticipate the presence of the licensee near the peril." (punctuation and footnotes omitted)).

[10] *Orff*, 285 Ga. App. at 489; *accord Bartlett*, 313 Ga. App. at 658.

[11] *Orff*, 285 Ga. App. at 489 (punctuation omitted); *accord Ward*, 281 Ga. App. at 877.

it is the plaintiff's knowledge of the specific hazard which caused the [injury] that determines whether the plaintiff can prevail on a premises[-]liability claim, not merely the plaintiff's knowledge of generally prevailing hazardous conditions or of other hazardous conditions in the area which plaintiff observes and avoids.[12]

Put another way, as to premises-liability claims, "[r]ecovery is allowed only when the [owner] had knowledge and the invitee did not."[13] Lastly, we are mindful that in a premises-liability case, "issues of the defendant's negligence, the plaintiff's negligence, and the plaintiff's lack of ordinary care for his own safety are generally not susceptible of summary adjudication."[14] But when, as here, "the evidence is plain, palpable, and undisputable . . . the trial court [can] conclude that a party is entitled to judgment as a matter of law."[15]

In this case, the undisputed evidence shows that Johnson, who had 18 years of experience in the construction industry (primarily as a roofer), testified to the

---

[12] *Orff*, 285 Ga. App. at 490 (punctuation omitted); *accord Ward*, 281 Ga. App. at 879 (2) (a).

[13] *Orff*, 285 Ga. App. at 489 (punctuation omitted); *accord Ward*, 281 Ga. App. at 877.

[14] *Ward*, 281 Ga. App. at 877; *accord Robinson*, 268 Ga. at 748 (2).

[15] *Ward*, 281 Ga. App. at 877; *accord Kennestone Hosp., Inc. v. Harris*, 285 Ga. App. 393, 395 (646 SE2d 490) (2007).

following: (1) when he carried the second wooden board outside, he knew that it had "a big ole sharp shard of glass on it[;]" (2) he would not have intentionally grabbed the glass because it would cut him, and he is "not an idiot[;]" (3) he knew that if the sharp glass came into contact with him, it was likely to cut him; (4) he knew that he had to handle the board properly because if the glass cut him, it could cause a "serious injury[;]" (5) he was aware of the specific risk that if he disposed of the board in the trash can in such a way that it bounced back up, the shard of glass could cut him; (6) he was wearing safety gloves at the time of his injury, presumably to protect his hands from the hazards of construction such as being cut by glass, and (7) it was Johnson's own decision to dispose of the wooden board in the manner that he did, as the only instruction Williams gave him was not to get any glass on the driveway.[16]

Notwithstanding the foregoing testimony, which clearly demonstrates that Johnson understood the risks of handling sharp glass, he also testified that he thought

---

[16] As previously noted, although Johnson's deposition and affidavit testimony conflicted with or contradicted some of the testimony we have just set forth, we reiterate that "self-contradictory testimony is construed against a party-witness, absent a reasonable explanation for the contradiction." *Shiver*, 269 Ga. at 169 (emphasis omitted); *see Walker v. Brannan*, 243 Ga. App. 235, 237 (533 SE2d 129) (2000) ("It is well established that on summary judgment a party's self-contradictory testimony, if unexplained, must be construed against the party-witness, even when the party-witness is the respondent rather than the movant."). And here, Johnson has not provided us with a reasonable explanation for his self-contradictory testimony.

that there was "some danger" that existed on the day in question that Williams should have warned him about. When asked to be more specific, Johnson testified that Williams should have warned him about "[t]he way [they] were doing the glass." And when asked to further explain the precise warning that should have been given, Johnson testified, "I mean basically once we start[ed] pulling the liquid nail[s] off it's going to start busting and shattering and you know, spider webbing." But Johnson agreed that when the glass initially "busted, shattered[,] and spider webbed in the basement," he was not "hurt even in the slightest way[,]" and he fails to explain how a warning about the glass shattering could have prevented the injury he later suffered outside. Johnson further testified that Williams should have instructed him to "bust" the glass in the garage, instead of carrying it outside, where he would have to "go through drop cords, go through sawhorses, [and] boxes and make it to the trash can." But again, Johnson admitted that he was not injured while carrying the board through any obstacles on his way to the trash can. Thus, even assuming that Johnson—a 35-year-old experienced roof mechanic—was unaware that glass might shatter and cut him when the boards were removed or that he could be cut by the glass while carrying the board to the trash can, neither of those scenarios occurred.

11

Nevertheless, Johnson argues that Williams had "superior knowledge of the mirror-like materials['] inherent danger because he personally installed it himself over twenty . . . years ago" and kept it affixed to his wall until 2014. But again, Johnson testified that he understood the dangers of handling sharp glass (*i.e.*, that it could cut him), and he fails to explain why Williams's knowledge of those same exact dangers was superior merely because he installed the mirror years before it shattered. Johnson further asserts that Williams "arguably led [him] into a dangerous trap because [he] could never have discovered numerous things surrounding same, . . . [such as] that the adhesive affixing the board to the mirror-like material was stronger than normal" or "whether the mirror-like material was resistant to shattering." But Johnson identifies no evidence suggesting that the strength of the adhesive or the mirror's level of resistance to shattering had anything to do with how he was ultimately injured. Indeed, Johnson testified several times that he could not remember the details of what happened. And although Johnson testified that he saw and was aware of the sharp glass attached to the board he was carrying, he now claims that Williams should have warned him of some unspecified "patent or latent" defects related to the mirror. But even Johnson acknowledges that he did not know of anything else that could have cut him other than the sharp piece of glass, which was visible to both Johnson

12

and Williams, and there is no evidence that any concealed defect in the construction materials caused his injury.[17]

Finally, relying solely on two cases, Johnson contends that, for summary judgment to be granted in a premises-liability case, this Court's precedent "requires the evidence to show that the [plaintiff] had numerous occasions and ample time to inspect and recognize the dangerous condition."[18] That is simply not true. Indeed, just

[17] Johnson makes a similar argument that his prior *general* experience in the construction industry was insufficient to show that he had knowledge of the *specific* danger posed by the mirror-like material in Williams's home. But this assertion is belied by his own testimony that he knew that he had to handle the second board carefully because the piece of glass attached to it was very sharp and could cause a serious injury if he came into contact with it. Indeed, throughout his brief, most of Johnson's arguments are premised on his assertion that the general construction materials in Williams's basement or the way in which the mirror was installed created a risk of injury of which he was unaware. This premise ignores the undisputed evidence that the *only* danger or hazard associated with Johnson's injury was the sharp shard of glass that cut him outside *after* the mirror shattered inside and that no other construction materials were involved in his injury.

[18] *See Landings Ass'n, Inc. v. Williams*, 291 Ga. 397, 399 (728 SE2d 577) (2012) (holding that a defendant landowner was entitled to summary judgment in a premises-liability case when the invitee, who was attacked and killed by an alligator, "either knowingly assumed the risks of walking in areas inhabited by wild alligators or failed to exercise ordinary care by doing so"); *Forest Cove Apartments*, *LLC v. Wilson*, 333 Ga. App. 731, 736 (776 SE2d 664) (2015) (holding that the owner of an apartment building was entitled to summary judgment on a premises-liability claim asserted by an independent contractor who was hired to make repairs to the property and injured herself when she fell through an upstairs bathroom floor that she knew had significant water damage when, *inter alia*, "[she] was responsible for inspecting

13

because we may have held that summary judgment was appropriate under such circumstances does not mean that those exact circumstances are *required* to authorize the grant of summary judgment in every premises-liability case. Furthermore, Johnson fails to explain why he needed additional time or numerous opportunities to fully appreciate the danger posed by sharp glass.

Simply put, although the sharp piece of broken mirror was made of glass, and perhaps hazardous to that extent, Johnson knew that he was handling a glass object and that people can be cut by glass, and Williams did not possess superior knowledge of that danger.[19] In fact, Johnson likely had superior knowledge to that of Williams regarding the danger posed by discarding the glass in the trash can because Williams was not present when Johnson was doing so and only Johnson knew his chosen method for disposing of the board prior to his injury. But regardless, Williams is entitled to summary judgment as to Johnson's premises-liability claim because, at the

---

the work area and determining for herself whether it was safe to remain standing on the [floor]").

[19] *See Aubain-Gray v. Hobby Lobby Stores, Inc.*, 323 Ga. App. 672, 672, 674 (1) (747 SE2d 684) (2013).

very least, Johnson and Williams had equal knowledge of the dangers posed by sharp glass.[20]

2. Given our holding in Division 1 that Williams is entitled to summary judgment because Johnson had equal, if not superior, knowledge of the hazard that caused his injury, we need not address Williams's remaining, alternative arguments as to why he is entitled to summary judgment.

---

[20] *See id.* (holding that a store owner was entitled to summary judgment on a customer's premises-liability claim when the customer picked up a candle holder and the glass globe that was resting on top of it fell, shattered, and cut her right wrist because, *inter alia*, "[the customer] knew that she was handling a glass object and that people can be cut by glass, and [the store owner] did not possess superior knowledge of that danger"); *Perkins v. Kranz*, 316 Ga. App. 171, 173 (2) (728 SE2d 804) (2012) (holding that a pedestrian, whose ear was punctured by a tree branch overhanging a sidewalk, could not recover on a premises-liability claim when "the tree and its overhanging branches were visible to [the pedestrian] and were in no way a pitfall, mantrap, or hidden peril"); *Briddle v. Cornerstone Lodge of Am.*, 288 Ga. App. 353, 355 (654 SE2d 188) (2007) (holding that the plaintiff, who was injured when she slipped and fell on water from an overflowing toilet, had equal, if not superior, knowledge than the defendant of the hazard because "any person with ordinary, common sense would recognize standing water on a floor as a hazard that might cause one to slip" (punctuation omitted)); *see also Williams*, 291 Ga. at 399 ("[T]he true ground of [premises] liability is the proprietor's superior knowledge of the perilous instrumentality and the danger therefrom to persons going upon the property. It is when the perilous instrumentality is known to the owner or occupant and *not known to the person injured* that a recovery is permitted." (punctuation omitted) (emphasis supplied)).

15

For all these reasons, we reverse the trial court's denial of Williams's motion for summary judgment.

*Judgment reversed. Ray and Self, JJ., concur.*